No. 18-3107

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

KIMBERLY BILINSKY,
Plaintiff-Appellant,

v.

AMERICAN AIRLINES, INC.,
Defendant-Appellee.

---

Appeal from the U.S. District Court
for the Northern District of Illinois
Eastern Division
Case No. 1:16-cv-04253
The Honorable Virginia M. Kendall

---

**BRIEF AND REQUIRED SHORT APPENDIX OF APPELLANT**

---

KAPLAN SAUNDERS VALENTE &
BENINATI, LLP
Charles A. Valente (#6198718)
Heather Kuhn O'Toole (#6277828)
William D. Nagel (#6288444)
500 North Dearborn Street, 2nd Floor
Chicago, IL 60654
(312) 755-5700

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3107

Short Caption: Kimberly Bilinsky v. American Airlines, Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kimberly Bilinsky

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kaplan Saunders Valente & Beninati, LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   n/a

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   n/a

Attorney's Signature: /s/ Charles A. Valente          Date: 12-10-2018

Attorney's Printed Name: Charles A. Valente

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X   **No**

Address: 500 N. Dearborn Street, Second Floor

Chicago, Illinois 60654

Phone Number: 312-755-5700          Fax Number: 312-755-5720

E-Mail Address: cvalente@kaplansaunders.com

rev. 01/15 GA

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................iii

I.   Jurisdictional Statement ........................................................................................ 1

II.  Statement of the Issues ......................................................................................... 1

III. Statement of the Case............................................................................................ 1

   A.   Relevant Procedural History and Issue for Review ....................................... 2

   B.   Statement of Facts.......................................................................................... 3

      1.   Kimberly Was A Longtime AA Employee Who Suffers From Multiple
          Sclerosis ............................................................................................... 3

      2.   As A Result Of Her Disability, AA Allowed Kimberly To Work From Home
          3

      3.   After AA Merged With US Airways, Kimberly Requested to Continue
          Working From Home as an Accommodation. ................................................ 6

      4.   AA Presented No Evidence That the Essential Functions of Kimberly's
          Position Changed After The Merger ............................................................ 7

      5.   Kimberly Successfully Performed the Essential Functions of Her Position
          After The Merger ....................................................................................... 7

      6.   In March 2015, AA Informed Kimberly That She Must Report to DFW
          Five Days A Week....................................................................................... 8

      7.   Despite Being the Supervisor's First Choice For An Open Position, AA
          Refused To Allow Kimberly To Transfer To A Position That Previously
          Had Been Performed By An Employee Working From Home. .................... 9

      8.   The District Court Granted AA's Motion for Summary Judgment ........... 10

IV.  Summary of the Argument .................................................................................. 12

V.   Argument ............................................................................................................ 12

   A.   Standard of Review ...................................................................................... 14

B.   There Is A Question of Material Fact Regarding Whether Kimberly's Presence in The DFW Headquarters Five Days A Week Was an Essential Job Function .......................................................................................................... 15

   1.   Courts Examine Several Factors When Determining Whether A Function Is Essential ...................................................................................... 15

   2.   No Single Factor Is Determinative of Whether A Job Function Is Essential 17

   3.   On Its Own, Physical Presence at The Workplace Five Days A Week Is Not an Essential Function. ...................................................................... 19

   4.   Kimberly Raised Numerous Issues of Fact Requiring A Jury to Weigh the EEOC Factors .......................................................................................... 19

   5.   The District Court Improperly Failed to Consider Factors Other Than the Employer's Judgment .............................................................................. 32

C.   Kimberly Has Raised A Genuine Issue of Material Fact Regarding Whether Telework From Home Some Days Each Week Is A Reasonable Accommodation. ............................................................................................. 36

VI.   Conclusion ...................................................................................................... 41

Certificate of Compliance with Type-Volume Limit ...................................... 43

Circuit Rule 30(d) Statement ............................................................................ 44

Certificate of Service ......................................................................................... 45

Required Short Appendix .................................................................................. 46

# Table of Authorities

**<u>Cases</u>**                                                                      **<u>Pages</u>**

<u>Anderson v. Liberty Lobby, Inc.</u>,
    477 U.S. 242 (1986) ..............................................................................14

<u>Bixby v. JP Morgan Chase Bank, N.A., et al.</u>, No. 10-405,
    2012 WL 832889 (N.D.Ill. Mar. 8, 2012) .............................................31,38

<u>Bridgewater v. Mich. Gaming Control Bd., et al.</u>, No. 16-10782,
    2017 WL 4517902 (E.D. Mich. Oct. 10, 2017) ....................................29-30

<u>Brown v. Smith, et al.</u>,
    827 F.3d 609 (7th Cir. 2016) ..............................................................16

<u>EEOC v. Ford Motor Co.</u>,
    782 F.3d 753 (6th Cir. 2015) ..............................................................15

<u>Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits</u>,
    601 F.3d 674 (7th Cir. 2010) ..........................................................25-27

<u>Holly v. Clairson Industries, L.L.C.</u>,
    492 F.3d 1247 (11th Cir. 2007) ...........................................................18

<u>Hostettler v. College of Wooster</u>,
    895 F.3d 844 (6th Cir. 2018) ..............................................16, 19, 34, 40-41

<u>Kauffman v. Petersen Health Care VII, LLC</u>,
    769 F.3d 958 (7th Cir. 2014) ...........................................................33-37

<u>Miller v. Ill. Dep't of Transp.</u>,
    643 F.3d 190 (7th Cir. 2011) ......................................................16, 37-38

<u>Mosby-Meachem v. Memphis Light, Gas & Water Div.</u>,
    883 F.3d 595 (6th Cir. 2018) ...........................................................28-29

<u>Omnicare, Inc. v. UnitedHealth Group, Inc.</u>,
    629 F.3d 697 (7th Cir. 2011) ..............................................................15

<u>Spurling v. C & M Fine Pack, Inc.</u>,
    739 F.3d 1055 (7th Cir. 2014) .............................................................14

Woodruff v. Peters,
482 F.3d 521 (D.C. Cir. 2007) ....................................................30

## Statutes, Regulations, and Official Guidance

28 U.S.C. § 1291........................................................................1

28 U.S.C. § 2106 .......................................................................1

28 U.S.C. § 2107........................................................................1

42 U.S.C. § 12101(a)(7) ............................................................41

42 U.S.C. § 12111...........................................1-2, 16-18, 32, 36

42 U.S.C. § 12112(b)(5)(A) ................................................15-16

42 U.S.C. § 12116...............................................................32

29 C.F.R. § 1630.2(n) ............................................17, 25, 27, 32

29 C.F.R. § 1630.2(o)(2)(ii) .....................................................19

29 C.F.R. § 1630, app. §1630.2(n) ..........................16-18, 32, 35-36

29 C.F.R. § 1630, app. §1630.2(o)............................................36

775 ILCS 5/1-101.................................................................2

EEOC Fact Sheet: Work At Home/Telework as a Reasonable Accommodation
(Dec. 20, 2017) [https://www.eeoc.gov/facts/telework.html] ...................19, 38-39

# I.    Jurisdictional Statement

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291, 2106, and 2107 because this is an appeal from a final decision of the district court, seeking to reverse the judgment of the district court granting summary judgment on Plaintiff-Appellant's claims of discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*, and related Illinois state law claims.

The date of entry of the final judgment sought to be reviewed is August 31, 2018. This appeal is from an order and final judgment that adjudicated all of the claims with respect to all of the parties, and no parties or issues remain in the district court. Appellant did not file a motion for new trial or alteration of the judgment. The notice of appeal was filed on September 28, 2018.

# II.    Statement of the Issues

Whether the district court erred in granting summary judgment when it held that Defendant's judgment that in-person attendance five days a week at its Dallas-Fort Worth headquarters ("DFW") outweighed Plaintiff's evidence that she could complete the essential functions of her position by working one day per week at DFW and working from home the remaining days of the week.

# III.    Statement of the Case

In 2007, Kimberly Bilinsky ("Kimberly"), a long-time employee of American Airlines, Inc. ("AA"), accepted a new position with AA specializing in corporate communications within the Flight Services Department. AA structured her new

position to allow her to work from home to accommodate her disability. After she successfully performed that job for eight years, AA required that Kimberly physically work from its Dallas-Fort Worth headquarters[1] five days a week based on a vague need to collaborate, and, as a result, denied Kimberly's renewed request to accommodate her disability by allowing her to continue to work remotely from home. AA did not engage in an interactive process to determine whether some other accommodation would be effective. Instead, because Kimberly's disability prevented her from working at DFW five days a week, AA terminated her employment. Kimberly filed the instant lawsuit.

## A. Relevant Procedural History and Issue For Review

Appellant Kimberly Bilinsky filed a complaint against Appellee American Airlines in the United States District Court for the Northern District of Illinois, alleging that it failed to accommodate her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 (Count I), and the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.* (Count III), when the airline denied her request to continue her work from home arrangement ("WFHA") as a Communications Specialist. After discovery closed, the district court granted summary judgment to AA on Kimberly's claims. Kimberly appeals from the summary judgment on Counts I and III.[2]

---

[1] AA's Dallas-Fort Worth headquarters is referred to herein as "DFW".
[2] Count II sought relief against AA based on retaliation against Kimberly for seeking an accommodation. Kimberly does not appeal from the summary judgment on Count II.

## B. Statement of Facts

### 1. Kimberly Was A Longtime AA Employee Who Suffers From Multiple Sclerosis

Kimberly was employed by AA from 1991 through 2015. [A-362, ¶1] For the last eight years of her employment, Kimberly was a Senior Specialist for Flight Service Communications ("Communications Specialist"). [A-362, ¶1]

Approximately 20 years ago, Kimberly was diagnosed with multiple sclerosis ("MS"). [A-362, ¶2] MS is a chronic, progressive, degenerative nerve disease. [A-362, ¶2] As a result of her MS, Kimberly suffers from:

- Monoparesis (right leg weakness and drop foot);
- Lack of coordination;
- Sensory loss;
- Spasticity (continuous contraction of muscles interfering with normal movement, speech, and gait);
- Myelopathy (neurologic deficit related to spinal cord); and
- Ataxia (lack of voluntary coordination of muscle movements that includes gait abnormality).

[A-362, ¶2] These ongoing conditions constitute a mobility impairment making walking extremely difficult for Kimberly. [A-362, ¶3] Heat, stress, and anxiety are exacerbating factors for Kimberly's MS. [A-362, ¶3]

### 2. As A Result Of Her Disability, AA Allowed Kimberly To Work From Home

In Spring 2007, Debbie Carvatta, AA's Regional Managing Director of Flight Service, encouraged Kimberly to apply for the Communications Specialist position. [A-362, ¶4] Carvatta was aware that Kimberly could not work in the Dallas area because of her MS. [A-362, ¶4] Kimberly applied for the position, and Laura Tolar, the hiring manager, offered her the job. [A-363, ¶5] Kimberly told Tolar that she

could not go to Texas because "[h]eat aggravates my medical … a medical condition." [A-363, ¶5] Tolar responded that she "was open to it. What I know about you, what I've read about you, what I've heard from your previous managers, let's see if this works." [A-363, ¶5] Kimberly and Tolar entered into a written "Work From Home Arrangement" under which Kimberly would work at DFW one day a week and from home during the remainder of the week. [A-123; A-363, ¶6]

Throughout the time she was in the job, there was no written job description. [A-364, ¶8; A-689 ¶7] Nevertheless, Kimberly's job duties included:

- representing the Flight Service Department on the daily Corporate Communications conference call;

- daily oversight of Flight Service website articles including writing, graphics, reviewing and posting flight attendant comments, and answering flight attendant questions;

- researching, preparing, writing, and publishing new Flight Service website feature articles, with a goal of publishing one new article per week;

- preparing the daily-communication for all Flight Service management employees (known as Good Morning American) that included news pertaining to the company and industry as well as all operational messages sent to flight attendants the previous day;

- daily oversight of FSWeb, the management partition of Flight Service website, used as a reference by base managers to assist flight attendants with policy and procedures;

- researching, preparing, and writing the Vice President's weekly Flight Service update;

- leading the weekly Flight Attendant Media campaign telephonic conference call which included representatives from each base and a PR consultant;

- leading the weekly Flight Attendant Media campaign telephonic conference call which included representatives from each base and a PR consultant;

- attending the weekly Flight Service Communications Staff Meeting in person at DFW;

- monitoring the Flight Service Communications sent to flight attendants and compiling an executive summary of the metrics for each communication;

- researching, writing, and publishing Flight Attendants in the Community articles, highlighting flight attendants who go above or beyond the call of duty in their community or during the course of their work, with a goal of completing one new article per month;

- responsible for writing, editing and sending specific Flight Service Communications:

  - <u>eFlash</u> - Publication designed to provide managers with need-to-know or emergency information for discussions with flight attendants.
  - <u>HI6</u> - Operational messaging sent to flight attendants via Sabre containing information they needed to know before starting their trips.
  - <u>Flight attendant emails</u> - Information that flight attendants needed to know, but not necessarily right before they departed on a trip.

- attending (either in person or via conference call) meetings for and reporting on various initiatives including (a) AA's Cashless program, (b) inflight WiFi, (c) Human Trafficking training, (d) new onboard amenities, (e) Food & Beverage changes, (f) aircraft fleet expansion, (g) new aircraft types, and (h) Collective Bargaining Agreement changes.

[A-363, ¶7; A-688 ¶7] The above-listed responsibilities are collectively referred to as "Kimberly's Job Duties".

These responsibilities required Kimberly to spend portions of each day communicating by telephone with AA bases throughout the country to obtain information and to interview AA employees. [A-379, ¶9]

Kimberly worked from home in her role as Communications Specialist for eight years, typically working from home for four days a week and at DFW one day per week or, on occasion, two days a week. [A-364, ¶9] During that time, there were no complaints about Kimberly's performance or the amount of time that she worked at DFW. [A-364, ¶9]

### 3. After AA Merged With US Airways, Kimberly Requested To Continue Working From Home As An Accommodation For Her Disability.

After AA merged with US Airways, Kimberly heard rumors that work from home arrangements of other Flight Service employees would be terminated, and that AA would require those employees to work from DFW. [A-364, ¶10] Concerned that her WFHA would be terminated and aware that living in the Dallas climate, due to its excessive heat, would aggravate her MS, Kimberly met with her immediate supervisor, Cathy Scheu, on May 20, 2014. [A-364, ¶10] At that meeting, Kimberly informed Scheu that, as a result of her MS, the WFHA was a necessary accommodation to allow Kimberly to continue performing her job. [A-365, ¶11]

AA did not have a policy in place to address requests for accommodation at the time of Kimberly's request. [A-365, ¶12] It failed to document its discussions with Kimberly regarding her request for accommodation. [A-365, ¶12] In fact, AA did not maintain any file regarding Kimberly's request for an accommodation. [A-365, ¶12]

## 4. AA Presented No Evidence That the Essential Functions of Kimberly's Position Changed After The Merger

Hector Adler, the Vice President for Flight Service, made the decision to deny Kimberly's request for accommodation, and he did so without input from Kimberly's manager regarding her work performance or job duties. [A-365, ¶13] Adler did not seek advice from AA's legal or human resources departments regarding Kimberly's request. [A-365, ¶13] He also failed to review any written policies related to requests for accommodation and did not even know whether such a policy existed. [A-365, ¶13] Adler had no knowledge about MS and did not review any information from AA's medical department regarding Kimberly's request. [A-365, ¶14]

AA presented no evidence of any change to Kimberly's Job Duties; instead, Adler simply decided that he wanted his entire team to be physically housed at DFW. [A-366, ¶15]

## 5. Kimberly Successfully Performed the Essential Functions of Her Position After The Merger

In November 2014, Linda Carlson became Kimberly's immediate supervisor and Carlson began reporting to Scheu. [A-366, ¶16] At that time, Kimberly continued to work from home and came to DFW as needed, sometimes at her supervisor's request and sometimes of her own accord. [A-366, ¶16] Carlson spoke to Kimberly by phone frequently. [A-366, ¶18] Kimberly would call in or would be dialed in whenever there was a meeting that required her participation. [A-366, ¶18]

Moreover, Kimberly was directed to help other Flight Service members with their job responsibilities so that they could work on other projects, including organizing certain special events. [A-366, ¶19] Carlson testified that "if you asked Kimberly to pick up the slack or to do a project, she was always willing to help or pick up slack." [A-366, ¶19]

AA presented evidence of only a single event organized by the Flight Service department. [A-366, ¶17] That event was the February 2015 American Airlines Leadership Conference. [A-251]. That evidence, however, failed to include any specifics such as (a) what specific tasks Flight Service employees – and Communication Specialists in particular – performed to organize the conference, (b) how long the conference lasted, (c) the number of conference attendees, (d) who attended the conference, or (e) the tasks Flight Service employees performed during the conference.

Carlson could not recall whether she even asked Kimberly to help with this conference. [A-253]. Similarly, Carlson could not recall any instance of Kimberly stating that there was something she could not do because she was in Chicago. [A-366, ¶19] Carlson never asked Kimberly to spend additional time at DFW, and Carlson had no issues with Kimberly's work product. [A-366, ¶20]

## 6. In March 2015, AA Informed Kimberly That She Must Report to DFW Five Days A Week

Notwithstanding that the decision had been made in November 2014 to rescind Kimberly's accommodation that allowed her to work from home, AA allowed Kimberly to continue working from home four days a week until March 2015 – nine

months after she met with Scheu in May 2014 to discuss the accommodation. [A-367, ¶21] In March 2015, Scheu and Rhonda Nicol-Perrin, an HR Manager, met with Kimberly, and Scheu told Kimberly for the first time that AA would not permit Kimberly to work from home any longer and that she would either have to report to DFW five days a week or find another job. [A-367, ¶22]

AA did not offer any other accommodation to Kimberly. [A-367, ¶24] In denying Kimberly's request, Scheu affirmed that there were no questions about Kimberly's qualifications or job performance, but the job would require Kimberly's presence at DFW five days a week. [A-367, ¶23] In fact, according to Scheu, during that nine-month period Kimberly had been performing her job at a "very high level", despite working from home approximately four days per week. [A-367, ¶23] AA made no attempt to identify an alternative accommodation for Kimberly. [A-367, ¶24] Instead, after telling Kimberly that her accommodation was being taken away, Scheu and Nicol-Perrin – for the first time – asked if there was some alternative accommodation that would work for her. [A-367, ¶24] Neither Nicol-Perin or Scheu made any suggestion of accommodations to be offered to Kimberly during the March 2015 meeting. [A-367, ¶25] Instead, they asked Kimberly to identify, on the spot, what could be done to accommodate her. [A-367, ¶25]

**7. Despite Being the Supervisor's First Choice For An Open Position, AA Refused To Allow Kimberly To Transfer To A Position That Previously Had Been Performed By An Employee Working From Home.**

While her request for a reasonable accommodation was pending, in December 2014, Kimberly applied for a technical writing position within the Flight Service

Department. [A-368, ¶26] The position was then held by an employee who also had a work from home arrangement since 2003. [A-368, ¶26] After interviewing and providing writing samples, Kimberly was advised by the interviewer (who was also the supervisor for the position) that she was the interviewer's first choice for the position. [A-368, ¶27] Kimberly had all of the qualifications for the technical writing position. [A-368, ¶27] The supervisor for the position did not express any concerns about Kimberly working from home were she to be hired for the position. [A-368, ¶28] Adler was aware that Kimberly applied for the position. [A-368, ¶28] Again, Adler made clear that he wanted all team members at DFW. [A-368, ¶28]

Notwithstanding that Kimberly was qualified for the technical writing position and that she was the interviewer/supervisor's first choice, AA denied Kimberly the position. [A-368, ¶29] AA presented no evidence that the duties of the technical writing position could only be performed at DFW.

## 8. The District Court Granted AA's Motion for Summary Judgment

AA moved for summary judgment on the grounds that Kimberly was not a "qualified individual" because she could not perform an essential function of her job, *i.e.*, work at DFW five days a week. AA did not dispute that Kimberly is a person who is disabled, that AA was aware of her disability, or that she was otherwise qualified for her position. [RSA-9,10].

The district court found that an "essential function" of Kimberly's position was being physically present at DFW five days a week. [RSA 10] The court's finding was based upon the following facts:

- AA merged with US Airways in December 2013. [RSA-2, 14]

- Adler concluded that the Flight Service Department as a whole was not adequately responding to unpredictable issues arising on a day-to-day basis. [RSA-11]

- Adler decided that an everyday presence at DFW was an essential function. [RSA-11]

- By working from home, Kimberly could not "do things you needed to do to support an event, such as driving to the event, checking out equipment, or directly meeting with flight service subject matter experts." [RSA-15]

- That Kimberly's absence "put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally." [RSA-15]

- The other two communications employees who previously worked from home were not permitted to continue doing so after the merger. [RSA-15,17]

The district court also held that Kimberly's evidence that she successfully performed – both before and after the merger – all of the duties of her position "[does] not **sufficiently outweigh** American's judgment and so Bilinsky does not provide the court with an adequate factual dispute." [RSA-12 (emphasis added)]

The district court determined that there was no genuine issue of material fact that Kimberly's job had changed to require her to perform her duties from DFW five days a week as an essential function of that job. Because Kimberly could not perform her job from DFW five days a week, the district court found that Kimberly was not a qualified individual under the ADA and entered judgment against her. (Based on the same analysis, the district court rejected Kimberly's claims under the Illinois Human Rights Act as well.) The district court therefore entered summary judgment against Kimberly on all counts.

## IV.  Summary of the Argument

The district court's decision to grant summary judgment in this case was in error because the district court resolved a material factual issue by accepting AA's determination on what was an essential function of the job and disregarding evidence that favored Kimberly.

The district court simply deferred to AA's judgment that it was essential that Kimberly perform her duties from DFW five days a week based on the needs of the Flight Services department resulting from the US Airways merger, Kimberly's perceived inability to contribute at special events, the strain on other employees if Kimberly worked from home, and because two other employees in the department also had their work from home arrangement terminated. The district court determined that Kimberly's evidence did "not sufficiently outweigh [AA's] judgment" RSA at 12-13.

In doing so, the district court ignored the conclusory nature of the AA's evidence. Kimberly had performed all of her job duties at a high level while working four days a week from home and one day a week from the office for fifteen months after the merger with good evaluations. AA presented no evidence that the merger caused some deficiency in her work product.  Additionally, the employer presented evidence of only one special event and never explained how that single, isolated event required that Kimberly's job be permanently re-located to DFW. Indeed, AA never even asked Kimberly if she could help at the event.  AA also presented no evidence as to the "strain" on other employees or how that supposed strain required

that Kimberly perform her duties at DFW five days a week. Moreover, despite a lengthy, undisputed list of Kimberly's responsibilities, AA presented no evidence of any change to those duties that required that any of the duties be performed at DFW. The only change presented was AA's decision that Kimberly's job be performed at DFW to which the district court simply deferred. The fact that two other employees had their jobs transferred to DFW is not probative of whether it was essential that Kimberly's job (or even those employees' jobs) be performed at DFW.

The employer's determination of what is essential is certainly relevant, but it is not entitled to unquestioned deference, particularly where that judgment is unsupported by specific evidence for the need. Moreover, what is an essential part of the job is inherently a question of fact that requires attention to a variety of factors, not least among which is prior history of how the job was performed – in this case, including Kimberly's eight year history of having successfully performed the job from home four days a week.

The district court weighed the evidence and disregarded factors favoring Kimberly to find that Kimberly could not perform an essential part of her job, *i.e.*, performing her job at DFW despite the fact that there was no evidence analyzing any of her specific job duties and why it was essential that any specific duty be performed at DFW.

In doing so, the district court substituted its judgment for that of a jury. Because a reasonable jury could, in fact, find that performing Kimberly's job five

days a week from DFW was not an essential requirement of her job and that a work from home arrangement was a reasonable accommodation for her disability, the district court overstepped its bounds in granting summary judgment for defendant. And, in doing so, the district court thwarted the ADA's mandate that employers reasonably accommodate individuals with disabilities so that they can remain productive members of the nation's workforce.

## V.   Argument

### A. Standard of Review

This Court reviews a grant of summary judgment *de novo* with all inferences made in favor of the non-moving party (in this case, the Appellant). <u>Spurling v. C&M Fine Pack, Inc.</u>, 739 F.3d 1055, 1060 (7th Cir. 2014). Accordingly, all issues raised in this brief are subject to *de novo* review.

The summary judgment standard is familiar. Summary judgment is appropriate only if the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The Supreme Court has observed that: "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>Anderson</u>, 477 U.S. at 248-249.

It is well-settled that courts do not weigh evidence or make credibility determinations when deciding motions for summary judgment because such considerations are for the jury. Omnicare, Inc. v. UnitedHealth Group, Inc., 629 F.3d 697, 704-5 (7th Cir. 2011).

## B. There Is A Question of Material Fact Regarding Whether Kimberly's Presence in The DFW Headquarters Five Days A Week Was an Essential Job Function.

The district court erred in granting AA's motion for summary judgment because Kimberly raised questions of material fact as to whether her physical presence at DFW five days a week was an essential function of her job.

In EEOC v. Ford Motor Co., 782 F.3d 753 (6th Cir. 2015), the Sixth Circuit recognized that while in-person attendance is an essential function of most jobs, the Americans with Disabilities Act ("ADA") "requires...employers to make reasonable accommodations for its employees, including allowing telecommuting under the proper circumstances." 782 F.3d at 764. In the instant case, the district court erred by deferring entirely to AA's claim that physical presence five days a week at DFW became an essential function of Kimberly's job and ignoring all evidence to the contrary.

## 1. Courts Examine Several Factors When Determining Whether A Function Is Essential

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" 42 U.S.C. §

12112(b)(5)(A). A "qualified individual" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). The "essential functions" of a job are the "fundamental" – non-marginal – activities of the employee. 29 C.F.R. § 1630.2(n)(1). In other words, a job function is essential if its removal would "fundamentally alter" the job. 29 C.F.R. § 1630, app. §1630.2(n); see also, Hostettler v. College of Wooster, 895 F.3d 844, 854 (6th Cir. 2018).

It is well-established that "[t]he essential-function inquiry is a factual question, *not* a question of law." Brown v. Smith, et al., 827 F.3d 609, 613 (7th Cir. 2016) (emphasis in original); see also Miller v. Ill. Dep't of Transp., 643 F.3d 190, 197 (7th Cir. 2011) (reversing summary judgment where jury could find accommodation request reasonable where plaintiff asked "that he be allowed to work as he had worked successfully for several years"); 29 C.F.R. § 1630, app. §1630.2(n).

When determining whether a function is essential, courts consider numerous factors including:

1. The employer's judgment as to which functions are essential;

2. Written job descriptions prepared before advertising or interviewing applicants for the job;

3. The amount of time spent on the job performing the function;

4. The consequences of not requiring the incumbent to perform the function;

5. The terms of a collective bargaining agreement;

6. The work experience of past incumbents in the job; and

7. The current work experience of incumbents in similar jobs.

<u>See</u> 42 U.S.C. §§ 12111(8), 12116; <u>see also</u> 29 C.F.R. § 1630.2(n)(3)(i)-(vii).

This is not an exhaustive list of factors and the Equal Employment Opportunity Commission ("EEOC"), in its regulations implementing the ADA, identified additional factors to be considered when determining whether a function is essential, including:

1. Whether the position exists to perform a particular function;

2. The number of other employees available to perform that job function or among whom the performance of that job function can be distributed;

3. Whether workflow follows a cycle of heavy demand followed by low demand; and

4. The degree of expertise or skill required to perform the function.

29 C.F.R. § 1630, app. §1630.2(n).

## 2. No Single Factor Is Determinative Of Whether A Job Function Is Essential

The determination of whether a job function is essential is based on the totality of the circumstances, with no single factor being dispositive and no factor being given more weight than any other. In particular, the EEOC regulations explain:

> Whether a particular function is essential is a factual determination that must be made on a case by case basis. In determining whether or not a particular function is essential, **all relevant evidence should be considered**. Part 1630 lists various types of evidence, such as an established job description, that should be considered in determining whether a particular function is essential. Since the list is

not exhaustive, other relevant evidence may also be presented. **Greater weight will not be granted to the types of evidence included on the list than to the types of evidence not listed.**

29 C.F.R. § 1630, app. §1630.2(n) (emphasis added).

In other words, an employer's judgment that full-time, physical presence in the office five days a week is an essential function is not entitled to any deference and is certainly not dispositive. In defining "qualified individual", the ADA stated only that "**consideration** shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8) (emphasis added). The EEOC regulations implementing the ADA similarly include the employer's judgment as just one of the several factors a court should consider. Notably absent from the ADA definition and the EEOC regulations is the word "deference."

Moreover, if an employer's judgment about what qualifies as an essential task were determinative of the issue, "an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is 'essential', avoid the clear congressional mandate that employers make reasonable accommodations." Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1258 (11th Cir. 2007) (reversing summary judgment for the employer and rejecting employer's argument that its judgment that strict punctuality was an essential function was dispositive of the issue).

### 3. On Its Own, Physical Presence At The Workplace Five Days A Week Is Not An Essential Function.

Presence at the workplace five days a week is not an essential function of the job simply because an employer says that it is. Rather, "an employer must tie time-and-presence requirements to some other job requirement." Hostettler v. College of Wooster, 895 F.3d 844, 856 (6th Cir. 2018) (reversing summary judgment for the employer where factual dispute existed as to whether the disabled employee could complete the position's essential functions on a modified work schedule).

If this were not the law, employers could refuse any accommodation that it decided conflicted with its preference, regardless of the individual's particular job duties. Not only would this undermine the purposes of the ADA, but it also would allow employers to negate the EEOC's regulations and guidance defining "reasonable accommodations" as including leave and telework. See Hostettler, 895 F.3d at 857; see also 29 C.F.R. § 1630.2(o)(2)(ii) and EEOC Fact Sheet: Work At Home/Telework as a Reasonable Accommodation (Dec. 20, 2017) [https://www.eeoc.gov/facts/telework.html] ("EEOC Guidance").

### 4. Kimberly Raised Numerous Issues Of Fact Requiring A Jury To Weigh The EEOC Factors

The district court's decision in this case rests on one legal conclusion: that after the December 2013 merger and continuing through March 2015 (when AA informed Kimberly that she needed to report to DFW five days a week), full-time physical presence at DFW was an essential function of Kimberly's position and no reasonable trier of fact could find otherwise. [RSA-8]. To reach this conclusion

however, the district court (a) uncritically accepted AA's unsupported "judgment" that physical presence at DFW five days per week became an essential function of Kimberly's job, regardless of her actual job duties, (b) summarily rejected Kimberly's evidence of her work experiences as a Communications Specialist, both before and after the merger took place, and (c) failed to consider all of the factors set forth in the ADA and EEOC regulations.

### (a)  AA's Supposed "Judgment"

AA's "judgment" is actually nothing more than a **preference** that Kimberly work at DFW five days a week. In this case, AA gave only one reason for why Kimberly's physical presence at DFW five days a week is an essential function: in the hectic post-merger environment, the Communications Specialist position required "the ability to interact [presumably face-to-face] quickly as situations arose." [RSA-12] The only interactions suggested by AA or the district court appear to be: (1) spur-of-the-moment meetings to address unexpected problems with communications products, and (2) scheduled special events. [RSA-11,15]

However, Kimberly presented evidence suggesting that, to perform her job duties effectively, Kimberly did not need to be prepared to handle unexpected problems with communications products through face-to-face interactions every day of the week. Moreover, there is no evidence that special events were commonplace. In fact, Kimberly, who continued to work from home approximately four days per week during the 15 months following the merger, put in ten- to twelve-hour days, and "picked up the slack" for her co-workers, pitching in to ensure that the day-to-

day responsibilities of the group were completed so that others could work on special projects.

An examination of the so-called undisputed evidence item-by-item reflects significant disputes that should be submitted by a jury and not decided as a matter of law:

| AA's "Undisputed" Evidence | Matters Disregarded by the District Court |
|---|---|
| With the merger, AA "had a legitimate reason for altering the job requirements." [RSA-14] | The only job requirement that was actually altered was that Kimberly's Job Duties formerly performed 4 days a week from home and one day per week at DFW now had to be performed five days a week at DFW.<br><br>AA's supposed "legitimate reason" is a conclusion unsupported by specific undisputed factual evidence. |
| Adler concluded that the Flight Service Department as a whole was not adequately responding to unpredictable issues arising on a day-to-day basis. [RSA-11] | While there is no dispute that Adler concluded as much, there is no evidence in the record to indicate that requiring Kimberly's Job Duties to be performed at DFW would remedy this concern.<br><br>AA offered no evidence of:<br>• The types of unpredictable issues that arose and whether any of those issues affected Kimberly's Job Duties;<br>• How frequently these issues arose post-merger;<br>• Whether employees needed specialized training or knowledge to respond to those issues; or<br>• Whether any of those issues could wait until Kimberly's next weekly visit to DFW. |

| AA's "Undisputed" Evidence | Matters Disregarded by the District Court |
|---|---|
| Adler decided that an everyday presence at DFW was an essential function [RSA-11] | While Adler may have concluded as much, there is no undisputed evidence in the record to support that his conclusion was anything more than his preference. Indeed, Adler:<br>• Did not know what Kimberly's Job Duties were; [A-365, ¶14]<br>• Did not make an effort to learn what Kimberly's responsibilities were; [A-365, ¶14]<br>• Thought that all Kimberly did was write emails sent to fight attendants; [A-365, ¶14] and<br>• Was not involved in distributing work amongst Flight Service employees, including Kimberly. [A-365, ¶14] |
| By working from home, Kimberly could not "do things you needed to do to support an event, such as driving to the event, checking out equipment, or directly meeting with flight service subject matter experts." [RSA-15] | AA presented evidence of only one event organized by the Flight Service department – the February 2015 American Airlines Leadership Conference. [A-251].<br><br>AA did not present evidence as to:<br>• What specific tasks Flight Service employees – and Communication Specialists in particular – performed in connection with events;<br>• How long the events lasted;<br>• The number of event attendees;<br>• How the events changed post-merger to explain why this had not been an issue in the seven years prior to May 2014 that Kimberly had worked as a Communications Specialist; or<br>• The tasks Flight Service employees were to perform during an event. |

| AA's "Undisputed" Evidence | Matters Disregarded by the District Court |
|---|---|
| | Moreover, when other members of the communications team worked on the special event, Kimberly helped cover their other job responsibilities. [A-366, ¶19] |
| Kimberly's absence "put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally." [RSA-15] | Carlson (Kimberly's supervisor) testified that:<br>• Kimberly "was always willing to help or pick up slack"; [A-366, ¶19]<br>• She could not recall whether she even asked Kimberly to help with American Airlines Leadership Conference; [A-253]<br>• She could not recall any instance of Kimberly stating that there was something she could not do because she was in Chicago; [A-366, ¶19]<br>• She never asked Kimberly to spend additional time at DFW; [A-366, ¶20] and<br>• She had no issues with Kimberly's work product. [A-366, ¶20]<br><br>AA did not produce any evidence of any actual "strain" and what the results of that strain were. Evidence of other employees resigning *en masse* over perceived unfairness merits a different analysis than a supervisor merely having to remember to email or telephone Kimberly to ask her to cover an assignment.<br><br>AA did not produce any evidence regarding why a supervisor could not simply call or email Kimberly to assign her a task. |
| The other two communications employees who previously worked from | While this clearly reflects Adler's preference, it does not indicate |

| AA's "Undisputed" Evidence | Matters Disregarded by the District Court |
|---|---|
| home were not permitted to continue doing so after the merger. [RSA-15,17] | anything about whether it was essential for Kimberly's Job Duties to be performed at DFW.<br><br>In any event, Adler testified that a group of employees with "headquarters positions" worked from Phoenix, Arizona until at least July 2017, three and a half years after the merger. [A-353 ¶¶43-44; A-456] Thus, it is apparent that AA did not consider it essential that their specific job duties had to be performed at DFW and begs the question of which of Kimberly's specific duties were essential to be performed at DFW. |
| | There was no written job description for Kimberly's position. [A-364, ¶8; A-689 ¶7] |
| | Kimberly's Job Duties were undisputed. [A-363, ¶7; A-688 ¶7] |
| | AA presented no evidence that any of Kimberly's Job Duties could only be performed at DFW. |
| | There is no evidence that AA added to, changed, or removed any of Kimberly's Job Duties. |
| | Kimberly was able to complete all of her Job Duties while working at DFW one day a week and from home during the remainder of the week. [A-364, ¶9] |
| | There were no complaints about Kimberly's performance or the amount of time that she worked at DFW. [A-364, ¶9] |
| | Scheu, another of Kimberly's supervisors, also testified that during the nine-month period during which AA was considering her accommodation request, Kimberly had performed her job at a "very high level", despite |

| AA's "Undisputed" Evidence | Matters Disregarded by the District Court |
|---|---|
| | working from home approximately four days per week. [A-367, ¶23] |

While a reasonable jury might ultimately agree with AA, there is more than sufficient evidence for a reasonable jury to conclude that a presence at DFW five days a week was **NOT** an essential function of Kimberly's job. This is a genuine issue of material fact that only a jury should resolve.

### (b)  The District Court Erred by Summarily Dismissing Kimberly's Evidence and By Not Taking It In The Light Most Favorable To Kimberly

The EEOC regulations make explicit that the court should consider the work experience of past incumbents in the job and the current work experience of incumbents in similar jobs to define the essential functions of a job. 29 C.F.R. § 1630.2(n)(3)(vi)-(vii).

According to the district court, Kimberly "ignores a key fact: that her job duties changed after the merger, requiring a physical presence in Dallas." [RSA-13] That change, however, was simply adding a new "requirement" that Communications Specialists be physically present at DFW five days a week. AA offered no evidence that any of Kimberly's Job Duties changed or that in any way ties the attendance requirement to Kimberly's Job Duties.

The district court completely disregarded Kimberly's evidence based upon the decision in <u>Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits</u>, 601 F.3d 674, 680 (7th Cir. 2010). In <u>Gratzl</u>, this Court explained that an employee "cannot prove that she is qualified for her current job simply by citing

evidence that she was qualified for a previous job, with different essential functions, that has been eliminated." [RSA-13-14] The district court also relied upon <u>Gratzl</u> for the premise that "deference to American's judgment as the employer is required in the absence of an adequate factual or legal basis to abandon that deference." [RSA-15]

Essentially, the district court first reached the legal conclusion that the essential functions of Kimberly's position changed to require her presence at DFW five days a week – even though there was no evidence that Kimberly's Job Duties themselves ever changed.[3] The district court then **used that conclusion** as the basis to disregard Kimberly's evidence – evidence which should have been considered in the district court's initial determination of that legal conclusion. This turns the analysis of what is considered an essential job function on its head.

Furthermore, the <u>Gratzl</u> case is distinguishable because it did not involve a work from home arrangement, but rather focused on whether an essential function of a court reporter's job was rotating through courtrooms. In that case, there was no dispute that a court reporter had to be present at the workplace to transcribe testimony.

In any event, the district court here did not properly apply the standards from <u>Gratzl</u> that it relied upon when entering judgment in favor of AA. In <u>Gratzl</u>, the plaintiff's "specialist" position had been eliminated by the State of Illinois and she was reclassified under the more generalized "official court reporter" job title.

---

[3] In contrast, in Gratzl, the plaintiff's job had been eliminated.

601 F.3d at 680. Despite the district court's conclusion that Kimberly's job had changed [RSA-13], there is no evidence in the record that the Communications Specialist position had been eliminated.[4] There is no indication in the record that, after the merger, any essential or specialized function of Kimberly's position had been removed or changed, or that Kimberly's job became more generalized. Instead, there had been no change to any of Kimberly's Job Duties listed above (see supra Section III(B)(2)) except for Adler's decision that these functions had to be performed at DFW. Thus, Kimberly's position after the merger (a) did not have different essential functions, and (b) had not been eliminated. At the very least, this is an issue of fact for a jury to decide.

Finally, Kimberly provided an "adequate factual or legal basis to abandon" the purported deference given to AA's supposed "judgment" that everyday attendance at DFW is an essential function of her job.

First, the EEOC's regulations state that "evidence of whether a particular function is essential includes…(vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in **similar jobs**." 29 C.F.R. § 1630.2(n)(3) (emphasis added). Here, the district court rejected Kimberly's evidence because "her job duties changed after the merger" and she "cannot prove that she is qualified for her current job simply by citing [*sic*] that show [*sic*] was qualified for a previous job, with different essential functions." [RSA-13]. Filling in

---

[4] Presumably, this is why AA and its experienced employment lawyers did not cite or rely upon the Graztl case before the district court.

the words missing from the court's opinion, the trial court did not consider Kimberly's testimony because it was not the current work experience of an incumbent **in the same job** – this, however, is not the standard set forth in the EEOC regulations, which allows consideration of work experiences of employees in similar jobs.

Second, courts routinely rely on evidence that the employee had previously succeeded in working remotely as creating a question of fact on the issue of whether full-time, in-person attendance is an essential function. The Sixth Circuit's recent opinion in Mosby-Meachem v. Memphis Light, Gas & Water Div., 883 F.3d 595 (6th Cir. 2018), is instructive. The plaintiff, an in-house attorney, was placed on ten weeks bed rest due to pregnancy complications. 883 F.3d at 600. She sought an accommodation to permit her to work from a bed, either in the hospital or at home, for the ten-week period. 883 F.3d at 600-1. For a three-week period, while her request for an accommodation was pending and until it was denied, the plaintiff worked from home and no one ever told her to stop doing so. 883 F.3d at 601.

After her request for an accommodation was denied, the plaintiff filed an action under the ADA based on her employer's failure to provide her with a reasonable accommodation. At trial, the plaintiff testified that she could perform the essential functions of her job remotely and that, in addition to the three-week period prior to the denial of an accommodation, she had previously done so over a two-week span following neck surgery several years before. 883 F.3d at 600. The plaintiff also presented the testimony of former employees who had occupied her

position, as well as outside attorneys with whom she worked, that the plaintiff could perform the essential functions of her job remotely. The jury returned a verdict for the plaintiff on her claim for denial of a reasonable accommodation and the district court denied the employer's motion for judgment as a matter of law.

On appeal, the employer argued that the requested accommodation to telecommute was "*per se* unreasonable" because several essential functions of her job could only be performed in person. 883 F.3d at 603. The Sixth Circuit rejected the employer's argument, finding the jury could reasonably conclude that the plaintiff could perform the essential functions of her job remotely. 883 F.3d at 604. The appellate court specifically noted the evidence established that the plaintiff's job was "not tied to her desk" and that she previously performed all of the essential functions of her job remotely. 883 F.3d at 604. Accordingly, the appellate court affirmed.

In Bridgewater v. Mich. Gaming Control Bd., et al., No. 16-10782, 2017 WL 4517902 at *1 (E.D. Mich. Oct. 10, 2017), an employer accommodated an employee's disability by allowing the employee to work a flexible schedule by, among other things, working from home when necessary due to his disability. The employee performed his job for more than a decade under the employer-approved flexible schedule, and, over those ten plus years, the employee received satisfactory or better performance evaluations. Bridgewater, 2017 WL 4517902, at *1. Without any fundamental change in the employee's job duties, the employer decided it would no longer permit the employee to work from home. Bridgewater, 2017 WL 4517902 at

*3. The employee filed suit under the ADA based on the employer's failure to accommodate his disability.

The employer sought summary judgment arguing that regular physical attendance at work was an essential function of the employee's job, and thus, as a matter of law, the employer had no obligation to accommodate the employee's request. Bridgewater, 2017 WL 4517902 at *6-8. The district court denied the motion and found that the employee's performance of the job for over a decade with satisfactory or better reviews under the flexible scheduling raised a question of fact as to whether attendance at work was an essential function of the job. 2017 WL 4517902 at *9-10.

Similarly, in Woodruff v. Peters, 482 F.3d 521, 523-524 (D.C. Cir. 2007), the employer granted an accommodation to allow an employee to telecommute. After several months, the employer reconsidered and discontinued the accommodation. 482 F.3d at 524. The district court entered summary judgment for the employer on the employee's ADA claim based on the failure to accommodate the employee's disability, holding that regular physical attendance by the employee was an essential function of his job. 482 F.3d at 525. The employee appealed, and the appellate court reversed finding that there was a question of fact as to whether regular physical attendance was an essential function of the employee's job given that the employer had previously allowed the employee to work from home. 482 F.3d at 528.

Kimberly presented a far stronger case than the plaintiffs in each of these cases, especially when her evidence is viewed in the light most favorable to her as the non-movant. Kimberly performed her job for eight years remotely, a job that was structured for work-from-home to accommodate her medical condition. Moreover, even after the May 2014 meeting between Scheu and Kimberly, when Kimberly told Scheu about her medical need for the work-from-home arrangement, Kimberly continued to work from home for nine months and did so at a "very high level." Ultimately, Adler decided that he wanted everyone physically at DFW and he did so despite several conversations with Scheu in which Scheu explained that Kimberly could do the job from Chicago.

Moreover, the district court relied heavily upon AA's evidence that "the other two communications employees who previously worked from home were not permitted to continue under their similar WFHA situations" to find that "American offers substantial evidence supporting its determination that a physical presence at DFW was an essential function of the Communications Specialist positions after the merger while Bilinsky offers insufficient evidence to create a dispute of material fact." [RSA-15] The district court also used this evidence to distinguish the instant matter from the facts presented in Bixby v. JP Morgan Chase Bank, N.A., 2012 WL 832889 (N.D.Ill. Mar. 8, 2012). [RSA 17] Nevertheless, Kimberly presented contradictory evidence – in form of deposition testimony from Adler – that a group of employees with "headquarters positions" worked from Phoenix, Arizona until at least July 2017, three and a half years after the merger. [A-353 ¶¶43-44; A-456]

Accordingly, the district court erred by disregarding Kimberly's evidence that she had previously succeeded in working remotely and the issue of whether her full-time presence at DFW was an essential function should have been left to a jury.

## 5. The District Court Improperly Failed to Consider Factors Other Than the Employer's Judgment

The key factors courts consider when determining whether a job function is considered essential are:

1. The employer's judgment as to which functions are essential;
2. Written job descriptions;
3. The amount of time spent on the job performing the function;
4. The consequences of not requiring the incumbent to perform the function;
5. The terms of a collective bargaining agreement;
6. The work experience of past incumbents in the job;
7. The current work experience of incumbents in similar jobs;
8. Whether the position exists to perform a particular function;
9. The number of other employees available to perform that job function or among whom the performance of that job function can be distributed;
10. Whether workflow follows a cycle of heavy demand followed by low demand; and
11. The degree of expertise or skill required to perform the function.

See 42 U.S.C. §§ 12111(8), 12116; 29 C.F.R. § 1630.2(n)(3)(i)-(vii); 29 C.F.R. § 1630, app. §1630.2(n). AA's judgment as to which functions are essential is only one of these factors.

Here, the district court uncritically accepted AA's judgment that full-time, in-person presence at DFW was an essential function (**Factor 1**, above), summarily rejected Kimberly's work experience both before and after the merger (**Factors 6 & 7**), and then simply ended its analysis. Had the district court considered the remaining factors, it would have identified ample issues of material fact requiring a jury determination.

For instance, there is no written job description (**Factor 2**) or collective bargaining agreement (**Factor 5**). Certainly, a written description of the Communications Specialist position would have offered a more objective listing of the work Kimberly was expected to perform. The district court did not explain how (or even if) the absence of a written job description or collective bargaining agreement impacted its decision. Instead, the district court had before it the deposition testimony of current AA employees who opined that Communication Specialists needed to be physically present at DFW five days each week to successfully perform their jobs, and the conflicting deposition testimony of Kimberly, who testified that she successfully performed the Communication Specialist job duties by working out of DFW one day per week and remotely the rest of the week, and the testimony of her two supervisors, Scheu and Carlson, both of whom testified that Kimberly successfully performed her job and neither of whom could identify a single task that Kimberly was asked to perform but could not due to her work-from-home arrangement.

In contravention of the standard on summary judgment, the district court weighed the evidence in favor of AA and against Kimberly, stating that "[Kimberly's] facts do not **sufficiently outweigh** American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute." [RSA-12-13 (emphasis added)]. Nevertheless, resolving a testimonial contradiction between depositions requires a trial. Kauffman v. Petersen Health Care VII, LLC, 769 F.3d 958, 962 (7th Cir. 2014).

Additionally, the record is devoid of evidence about how much time Communication Specialists spent performing each of their functions (**Factor 3**). For instance, AA did not present evidence related to whether unexpected problems with communications products arose every day or whether they could be postponed until Kimberly was next in the office, which was at least one day each week. Moreover, the district court did not tie the physical presence at DFW requirement to any of Kimberly's Job Duties. See Hostettler, 895 F.3d at 856. Thus, deposition testimony that Kimberly "could not do things you need to do to support an event, such as driving to the event, checking out equipment, or directly meeting with flight service subject matter experts" is meaningless without facts related to how much time was spent on these tasks. This is because a function "[is not] essential if it was so small a part that it could be reassigned to other employees at a negligible cost to the employer." Kauffman, 769 F.3d at 962. Notably, AA presented evidence of only one event, the February 2015 American Airlines Leadership Conference, and Kimberly's supervisor could not even recall if she asked Kimberly to help with that event or if she simply assumed that Kimberly could not help. [A-251-253] Accordingly, a jury could reasonably conclude that assisting with events was not an essential function of Kimberly's position.

The consequences of not requiring Kimberly to be present full-time at DFW (**Factor 4**) and the number of other employees available to perform that job function or among whom the performance of that job function can be distributed (**Factor 9**) are related in this case. These factors are significant because "circumstances might

exist when employees working in teams are able to share duties among themselves, so that such sharing might be a form of reasonable accommodation." <u>Kauffman</u>, 769 F.3d at 963. The EEOC regulations explain:

> For example, if an employer has a relatively small number of available employees for the volume of work to be performed, it may be necessary that each employee perform a multitude of different functions. Therefore, the performance of those functions by each employee becomes more critical and the options for reorganizing the work become more limited. In such a situation, functions that might not be essential if there were a larger staff may become essential because the staff size is small compared to the volume of work that has to be done.

29 C.F.R. § 1630, app. §1630.2(n).

According to AA, Kimberly's "absence put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally." [RSA-15]. This conclusion, however, is not supported factually. For instance, there is no evidence of any specific "strain". Similarly, there is no evidence as to why someone could not call Kimberly to assign her a task. Regardless, Kimberly provided contrary evidence that after the merger (a) she contributed equally, (b) she "was always willing to help or pick up slack" in the department, and (c) she helped other Flight Service members with their job responsibilities while they worked on other projects so that the day-to-day operations of the department were not negatively affected by her working remotely. Such contradictory testimony can be resolved only at a trial.

AA failed to present evidence regarding whether the position exists to perform a particular function (**Factor 8**), whether the workflow follows a cycle of

heavy demand followed by low demand (**Factor 10**), or the degree of expertise or skill required to perform the function (**Factor 11**). The district court presumed that the workflow demand in the post-merger environment remained consistently high from the December 2013 merger through March 2015, when AA required Kimberly to work at DFW five days a week. This presumption, however, is not supported in the record. It is entirely possible that the workflow demanded of the Flight Service department decreased with time as the work of combining the two airlines was completed. The district court should have considered whether there was variation in workflow demand because the performance of an essential function may be less critical during periods of low demand than during high-demand periods. See 29 C.F.R. § 1630, app. §1630.2(n). Like the other factors, the level of workflow demand is also an issue of fact.

The district court failed to consider any factors other than the employer's judgment and, by doing so, failed to recognize numerous disputed issues of fact that precluded entry of summary judgment.

### C. Kimberly Has Raised A Genuine Issue of Material Fact Regarding Whether Telework From Home Some Days Each Week Is A Reasonable Accommodation.

Kimberly has raised a genuine issue of material fact as to whether telework from home some days each week is a reasonable accommodation for her position.

A disabled individual is considered 'qualified' if they can perform the essential functions of the position with or without reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630, app. §1630.2(o). In Kauffman v. Petersen

Health Care VII, LLC, 769 F.3d 958, 963 (7th Cir. 2014), this court explained that "circumstances might exist when employees working in teams are able to share duties among themselves, so that such sharing might be a form of reasonable accommodation."

Miller v. Ill. Dep't of Transp., 643 F.3d 190, 192 (7th Cir. 2011), is instructive in this regard. In Miller, the plaintiff was employed by IDOT as a member of a bridge crew. He was diagnosed with acrophobia, a fear of heights, after a panic attack while working, and subsequently sought a reasonable accommodation to not be required to work "on bridge beams and other extreme places" over a certain height. 643 F.3d at 193-94. This request was denied, and the plaintiff filed suit. 643 F.3d at 194. The district court granted summary judgment in favor of the employer, finding that working at certain heights was an essential function of the job and rearranging job tasks among crew members was unreasonable. 643 F.3d at 194. This Court reversed, finding:

> We are confident that some high work in exposed or extreme positions is an essential function of the bridge crew as a whole. IDOT would have us take that point a step further to find that **any** individual assigned to the bridge crew had to be able to perform **each and every task** of the entire bridge crew. That would require finding that every task required of the bridge crew **as a whole** was an essential task of each bridge crew member. On this record, we cannot make that finding as a matter of law.

643 F.3d at 198 (emphasis added).

Ultimately, this Court determined in Miller that a reasonable jury could find that the plaintiff's request for accommodation, namely that other members of his team substitute for him when a task required working above a certain height in

extreme positions, was reasonable. 643 F.3d at 198. In reaching this decision, the Court noted that the ADA provides that the term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 643 F.3d at 198-99 (quoting 42 U.S.C. § 12111(9)(B) (2008)).

This determination of reasonableness is a fact issue. For example, in Bixby v. JP Morgan Chase Bank, N.A., et al., No. 10-405, 2012 WL 832889 at *9 (N.D.Ill. Mar. 8, 2012), the district court recognized that a court must look to the particular facts and circumstances of each case to determine the reasonableness of a work from home accommodation. Absent evidence that the employee's job responsibilities could not be performed from home, that the employer could not review or supervise the employee's work, or that the employee's performance would have suffered from working at home, the district court found a question of fact existed as to the reasonableness of a work from home accommodation and denied the employer's motion for summary judgment. 2012 WL 832889 at *9-11.

The EEOC has also articulated factors that should be considered in determining the reasonableness of a work from home accommodation. Specifically, courts should consider:

(a) the employer's ability to supervise the employee adequately;

(b) whether any duties require use of certain equipment or tools that cannot be replicated at home;

(c) whether there is a need for face-to-face interaction and coordination of work with other employees;

(d) whether in-person interaction with outside colleagues, clients, or customers is necessary; and

(e) whether the position in question requires the employee to have immediate access to documents or other information located only in the workplace.

EEOC Guidance at ¶4.

Taking each of these factors in turn, Kimberly has presented enough evidence to raise a genuine issue of material fact.

**Supervision:** Kimberly informed her own supervisor and another supervisor, prior to accepting the position of Communications Specialist, that she could not live in Texas due to a medical condition. Nonetheless, she was encouraged to apply and was awarded the position. To accommodate her medical condition, Kimberly and her supervisor agreed to the work from home arrangement. Defendant did not dispute that Kimberly successfully performed her job for eight years under this arrangement and there is no evidence in the record suggesting that Kimberly's immediate supervisors ever complained about her work.

**Equipment and tools:** AA did not contend that Kimberly's position required her to use specialized equipment or tools only available at DFW.

**Face-to-face interaction with other employees:** Where, as is the case here, an employer contends that face-to-face contact and coordination with other employees requires full-time, in person attendance, the EEOC explains that "An employer

should not…deny a request to work at home as a reasonable accommodation solely because a job involves some contact and coordination with other employees. Frequently, meetings can be conducted effectively by telephone and information can be exchanged quickly through e-mail." EEOC Guidance at ¶4. Here, Defendant presented no specific evidence that Kimberly could not "collaborate" or "engage" remotely with co-workers. On the other hand, Kimberly presented evidence that following the merger she (a) continued to perform at a "very high level", (b) there were no issues with her work products, and (c) "picked up the slack" for her co-workers, pitching in to ensure that the day-to-day responsibilities of the group were completed so that others could work on special projects.

**In-person interaction with outside colleagues or customers:** The only evidence proffered by AA with regard to this factor is that Kimberly "could not do things you need to do to support an event, such as driving to the event, checking out equipment, or directly meeting with flight service subject matter experts." [RSA-15] However, as discussed above, there was evidence of only one such event in the 15 months following the merger.

**Immediate access to information located only at DFW:** AA did not contend that Kimberly required immediate access to any documents or information located only in the workplace in order to perform Kimberly's Job Duties.

The Sixth Circuit, in <u>Hostettler v. College of Wooster</u>, 895 F.3d 844, 857 (6th Cir. 2018), recently recognized the fact-intensive nature of this determination:

> [The employer] may have preferred that [the employee] be
> in the office 40 hours a week. And it may have been more

efficient and easier on the department if she were. But those are not the concerns of the ADA: Congress decided that the benefits of gainful employment for individuals with disabilities – dignity, financial independence, and self-sufficiency, among others – outweigh simple calculations of ease or efficiency. To that end, the ADA requires that employers reasonably accommodate employees with disabilities, including allowing modified work schedules. An employer cannot deny a modified work schedule as unreasonable unless the employer can show *why* the employee is needed on a full-time schedule[.]

895 F.3d at 857 (emphasis in original).

Here, AA has not clearly articulated why Kimberly was required to be present at DFW five days a week. Kimberly, on the other hand, presented evidence that Adler simply decided to follow his "vision" to have all employees physically report to DFW without regard for, or even knowledge of, the specifics of Kimberly's position. On this record, Kimberly has raised a genuine issue of material fact as to whether her request to continue her WFHA was a reasonable accommodation for her position and the district court erred by entering judgment in favor of AA.

## VI.  Conclusion

Congress adopted the ADA with the express purpose of assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(7). This was seen not merely as a benefit to the individuals with disabilities, but as a benefit to both society and the economy at large. And, while working from home traditionally has been disfavored in our society, the advances in modern technology – primarily in communication technologies – have created myriad and commonplace opportunities for workers to

effectively telecommute to work. These advances are a boon to individuals with disabilities and go a long way to advancing the public policies at the heart of the ADA.

Whether it is reasonable for an employer to accommodate an individual with disabilities by allowing that individual to work from home on any particular basis is inherently a question of fact for the jury. And, where as here, an employee performed the same job functions for years from home four days a week, reporting to the office only one (or two) days a week, there is sufficient evidence for a jury to find reasonableness even in the face of the employer's stated preference that all work be performed on the employer's premises.

For the foregoing reasons, this Court should reverse the district court's judgment and remand this matter for trial on Counts I and III of the complaint. Pursuant to Circuit Rule 36, Plaintiff-Appellant requests that on remand this matter be reassigned to a different judge of the district court.

KIMBERLY BILINSKY

By: /s/ **Charles A. Valente**
Charles A. Valente (#6198718)
Heather Kuhn O'Toole (#6277828)
William D. Nagel (#6288444)
Kaplan Saunders Valente &
    Beninati, LLP
500 North Dearborn Street, 2nd Floor
Chicago, IL 60654
(312) 755-5700

Attorneys for Plaintiff-Appellant
Kimberly Bilinsky

## Certificate of Compliance with Type-Volume Limit

Certificate of Compliance With Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

The undersigned, counsel of record for the Plaintiff-Appellant, Kimberly Bilinsky, hereby certifies that:

1. This brief conforms to the rules contained in Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32(c) because this brief contains 10,596 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 12-point font size in the Century Schoolbook style.

Dated: **December 10, 2018**

KAPLAN SAUNDERS VALENTE & BENINATI, LLP

By: /s/ **Charles A. Valente**
Charles A. Valente (#6198718)
Heather Kuhn O'Toole (#6277828)
William D. Nagel (#6288444)
500 North Dearborn Street, 2nd Floor
Chicago, IL 60654
(312) 755-5700

Attorneys for the Plaintiff-Appellant,
Kimberly Bilinsky

# Circuit Rule 30(d) Statement

Pursuant to Circuit Rule 30(d), the undersigned counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

KAPLAN SAUNDERS VALENTE &
BENINATI, LLP

By: /s/ **Charles A. Valente**
Charles A. Valente (#6198718)
Heather Kuhn O'Toole (#6277828)
William D. Nagel (#6288444)
500 North Dearborn Street, 2nd Floor
Chicago, IL 60654
(312) 755-5700

Attorneys for the Plaintiff-Appellant,
Kimberly Bilinsky

## Certificate of Service

The undersigned, counsel for the Plaintiff-Appellant, Kimberly Bilinsky, hereby certifies that on December 10, 2018 he electronically filed the *Brief and Required Short Appendix of Appellant* and the *Separate Appendix* with the Clerk of the Court for the United States Court of Appeal for the Seventh Circuit using the CM/ECF System and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: **December 10, 2018**

KAPLAN SAUNDERS VALENTE &
BENINATI, LLP

By: /s/ **Charles A. Valente**
Charles A. Valente (#6198718)
Heather Kuhn O'Toole (#6277828)
William D. Nagel (#6288444)
500 North Dearborn Street, 2nd Floor
Chicago, IL 60654
(312) 755-5700

Attorneys for the Plaintiff-Appellant,
Kimberly Bilinsky

# Required Short Appendix

## Table of Contents

Memorandum Opinion and Order (granting summary judgment)
entered August 31, 2018……………………………………………..     RSA 1-23


Judgment in a Civil Case entered August 31, 2018………………..     RSA 24

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KIMBERLY BILINSKY,          )
                                     )
                *Plaintiff*,     )     No. 16 C 4253
     v.                     )
                                     )     Hon. Virginia M. Kendall
AMERICAN AIRLINES, INC.,     )
                                     )
            *Defendant*.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Bilinsky sued American Airlines, Inc. ("American") alleging violations of her rights under the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12203 ("ADA"), by denying her a reasonable accommodation (Count I) and retaliation for requesting a reasonable accommodation (Count II). Bilinsky also alleges the same conduct violated the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq.* ("IHRA") (Count III). American moves for summary judgment as a matter of law on all three counts. *See* (Dkt. No. 59). For the following reasons the Court grants American's Motion. [59.]

## BACKGROUND

The following facts from the parties' Local Rule 56.1 Statements are undisputed unless otherwise noted.[1] Bilinsky is a former American employee who suffers from multiple sclerosis ("MS"). *See* (Dkt. No. 61, at ¶¶ 1, 8) (Def.'s SOF). Her MS causes weakness on the right side of her body impacting her gait, strength, and balance, which can be exacerbated by heat and stress. *Id*. ¶ 9. She also is unable able to run or do other physical activities that require balance but can use a computer. *Id*. ¶ 13.

---

[1] American challenges many of Bilinsky's responses to its Statement of Facts as improper. *See* (Dkt. No. 76, at 13). Those challenges have been carefully reviewed and the facts take those challenges into account.

RSA 1

### 1. Pre-Merger Employment

Bilinsky started working for American in 1991 where she held various positions, eventually becoming a Senior Specialist, Flight Service Communications ("Communications Specialist") in the Flight Service Department in 2007. *Id*. ¶ 3. The position reported to American's headquarters in Fort Worth, Texas, located near Dallas/Fort Worth International Airport ("DFW"). *Id*. ¶¶ 2, 20. Around the time of her interview for the position, Bilinsky informed hiring manager Laura Tolar ("Tolar") that she would be unable to move to Texas because heat aggravated her medical condition. *Id*. ¶ 21. Consequently, Tolar and Bilinsky reached what they called a "work-from-home arrangement" ("WFHA") where Bilinsky could work primarily from her home in Lake Barrington, Illinois, while traveling to DFW approximately one day per week and with occasional travel to locations other than DFW as well. *Id*. ¶¶ 6, 24. Although there was no written job description for her position, Bilinsky's responsibilities included: researching, writing, editing and publishing numerous articles and communications for the Flight Services Department; managing a Flight Service website and database; providing weekly service updates; attending daily conference calls; and attending a weekly staff meeting in Dallas, Texas. *See* (Dkt. No. 67, at ¶¶ 7-8) (Pl.'s SOAF).

### 2. Post-Merger Employment

In December 2013, American merged with US Airways. *See* (Dkt. No. 61, at ¶ 28). The merger required American to combine its operational processes with US Airways so as to obtain a "single operating certificate," while also instigating an integration process to merge procedures, operations, collaboration tools, and media channels. *Id*. ¶ 29; *see also* (Dkt. No. 62-2, Ex. 7, at 24:9-25:8) (Carlson Dep.). Hector Adler ("Adler"), then Vice

**RSA 2**

President of the Flight Service Department, testified this undertaking was a complicated endeavor requiring coordination between multiple departments. *See* (Dkt. No. 61, at ¶ 30); (Dkt. No. 62-2, Ex. 6, at 23:3-17) (Adler Dep.). Specifically, Adler noted:

> "The flight services department had responsibility to combine the policies and procedures for flight attendants between two legacy carriers into a single operating manual and at the same time work in cooperation with the other operating departments to ensure that we were coordinated at every point. We had to develop the procedures, write the manuals, and communicate changing information to the employees. It was a very extensive and significant task that involved nearly every person in the department."

*Id*. He further described the post-merger environment as one in which the communications team "needed to able to communicate on short notice" and need to "respond to the myriad of problems and deadlines that were coming up every day often without prior notice." *Id*. 36:5-10. With all the tasks requiring participation in meetings and strategy, Adler added, there were not enough people to go around and he felt it "special that all of [the team] be in one place." *Id*. 11-22. Early in 2014, based on the changing environment, Adler transitioned Bilinsky's communications team to one "with a higher degree of in-person engagement" and required all Flight Service Department employees with DFW-based positions work from DFW including those who previously worked from home on a regular basis. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17).[2,3] During this

---

[2] Bilinsky notes that as of July 2017, certain employees from the Department were based in Phoenix, Arizona. *See* (Dkt. No. 67, at ¶ 37). However, this factual dispute is irrelevant for two reasons: first, according to Adler, the Phoenix employees must work from Phoenix because they perform administrative functions for which the operating systems are not integrated into American's system at DFW. *See* (Dkt. No. 67-6, Ex. E, at 14:13-15:18); and second, American claims the Department employees in Phoenix did not have "headquarters positions" in the first place, and thus were not subject to the same requirements as Bilinsky. *See* (Dkt. No. 76, at 16).

[3] Bilinsky disputes these observations; reiterating that Adler did not personally work with Bilinsky and neither he nor Rhonda Nicol-Perin ("Nicol-Perin") of Human Resources had adequate understanding of Bilinsky's everyday responsibilities. *See, e.g.,* (Dkt. No. 67, Pl. Resp. at ¶¶ 34-41). Regardless of the merit of these points, they are not responsive to American's observations of the general environment at headquarters and the reason Defendant transitioned the Department.

**RSA 3**

same time only two other Flight Services Department employees worked on some form of WFHA and when American changed its policy after the merger one of them relocated. *See* (Dkt. No. 61, at ¶ 42). The other employee refused to relocate from California and was therefore subject to the same reduction-in-force. *Id*.

Fearful that these changes would impact her WFHA and that the Dallas climate would limit her functions, Bilinsky met with her immediate supervisor Cathy Scheu ("Scheu") on May 20, 2014. *See* (Dkt. No. 67, at ¶ 10). Bilinsky informed Scheu that her current WFHA was a necessary accommodation for her to keep doing her job because of her disability. *Id*. at ¶ 11.[4] After internal consultations between Adler, Scheu, Human Resources employee Rhonda Nicol-Perin ("Nicol-Perin"), and American's Area Medical Director Dr. Jeral Ahtone ("Ahtone"), Adler ultimately decided to deny Bilinsky's request to continue with her current WFHA. *See* (Dkt. No. 61, at ¶¶ 50, 60); (Dkt. No. 62-2, Ex. 2, 29:1-10) (Nicol-Perin Dep.); (Dkt. No. 67, at ¶ 13). Adler based denial of Bilinsky's request in part on his decision to have his entire communications team physically housed at DFW. *See* (Dkt. No. 67, ¶ 15).

### 3. Accommodation Denial and Termination

Scheu and Nicol-Perin informed Bilinsky that her request to continue the WFHA had been denied and asked her what other accommodations American could make at DFW that would permit Bilinsky to work there. *See* (Dkt. No. 61, at ¶¶ 60, 61). But Bilinsky made clear that "unless the company could provide a tube of air conditioning around her body 24 hours a day," there was no possible accommodation available. *Id*. ¶ 61. According

---

[4] It is unclear whether Bilinsky specifically requested an accommodation during this meeting, but this is immaterial based on subsequent events indicating that she requested an accommodation that was received and processed by American. *See* (Dkt. No. 61, at ¶¶ 47-50, 76).

Bilinsky it was not the conditions at headquarters specifically; rather it was the location of headquarters *in Texas* that made it impossible for her to relocated. *Id.* ¶¶ 61, 62. Unable to agree on an accommodation for a position at DFW, American allowed Bilinsky to apply for other available positions while Scheu and Nicol-Perin checked to see if there were open positions in Chicago. *Id.* ¶ 64.

American informed Bilinsky that her last day as a Communications Specialist would be March 27, 2015, and that she would be placed on administrative leave until April 30 to allow her time to apply for other positions including a position as Specialist Corporate Sales based in Chicago. *Id.* ¶¶ 65, 66. Both Scheu and Nicol-Perin assisted Bilinsky with the search process and in trying to obtain a different, amicable position with American. *Id.* ¶¶ 67, 68, 69. For example, around March 25, 2015, Scheu contacted Bilinsky about a vacant Specialist Corporate Sales position based in Chicago. *Id.* ¶¶ 65, 67, 68. Scheu and Nicol-Perin reached out to colleagues on Bilinsky's behalf, but she was not selected because she lacked the requisite experience. *Id.* ¶¶ 67, 68, 73. Nicol-Perin looked for other positions in the Flight Services Department in Chicago as well, but there were none. *Id.* ¶ 69. There were other support staff positions open in Chicago at the time, but Bilinsky told Nicol-Perin she was uninterested in any of them. *Id.*

Around the same time Belinsky asked to continue with her WFHA, she also applied for an Analyst, Manuals, and Documentation position based out of DFW. *Id.* ¶¶ 76, 77. The employee who previously held that position prior to the merger worked from home and refused to relocate to DFW and so was subject to reduction-in-force. *Id.* ¶ 78. American ultimately hired someone else for the Analyst, Manuals, and Documentation position in part because it required work at DFW "and not from a remote location,"

although Belinsky believes she was denied the position for the same reasons she was unable to continue her WFHA in her former position. *Id.* ¶¶ 78, 79, 80.

Bilinsky's last day at American was May 1, 2015. *Id.* ¶ 4. She filed her Charge of Discrimination of the Equal Employment Opportunity Commission May 4, 2015 and received her Right to Sue letter on March 8, 2016. *See* (Dkt. No. 1, at ¶ 4; Ex. A). She filed the current Complaint roughly one month later. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). A genuine dispute of material fact exists if, based on the evidence, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must set forth facts that show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255. Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## DISCUSSION

**RSA 6**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). An employer's failure to make a reasonable accommodation for any employee with a known disability constitutes prohibited discrimination under the ADA. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008). The same section further defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability … or … denying employment opportunities to a job application or employee who is an otherwise qualified individual with a disability, if such a denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(A)-(B).

The ADA also "prohibits employers from retaliating against employees who assert their rights under the act to be free from discrimination." 42 U.S.C. § 12203(a); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). This includes retaliation even where the initial claim of discrimination is found to be meritless. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

American seeks summary judgment on Belinsky's ADA claims alleging American failed to accommodate her and for retaliation for not selecting her for the Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 60, at 3, 5-6). American's position is that Bilinsky fails to meet her initial burden of proving she was a qualified individual or – even

**RSA 7**

if she has – that they engaged in an interactive process for a reasonable accommodation. *Id*. at 5-6. As for the retaliation claims, American argues Bilinsky fails to establish a causal connection between her request for an accommodation and American's decision not to hire her for the Corporate Sales position. *Id*. at 3. They further seek judgment as a matter of law on the identical claims filed pursuant to the IHRA. *Id*. at 18-19.

## A. Failure to Accommodate

The ADA permits two categorical claims for discrimination: disparate treatment and failure to accommodate. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015); *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001). Count I does not allege facts consistent with a disparate treatment claim. *See generally* (Dkt. No. 1) (failing to allege discrimination pursuant to 42 U.S.C. § 12112(a)). More so, Bilinsky concedes that she "filed an action under the ADA based on her employer's failure to provide her with a reasonable accommodation," *see* (Dkt. No. 71, at 11), and does not challenge American's assertion that Count I solely raises a failure to accommodate claim and not one for disparate treatment. *See* (Dkt. No. 60, at 5); *see generally* (Dkt. No. 71). Bilinsky alleges that American violated the ADA when it denied her request to continue working pursuant to her existing WFHA and did not offer her any alternative accommodation. For its part American argues that Bilinsky was not a qualified individual because she was unable to perform the essential functions of her job after the merger. *See* (Dkt. No. 60, at 6-11).

To succeed on a claim for failure to accommodate, a plaintiff must show that she is a "qualified individual" with a disability and that her employer is aware of her disability.

*See Basith*, 241 F.3d at 927; *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013). The term "qualified individual" is defined as:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desire. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that she is a qualified individual who could perform the essential functions of her position. *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). Additionally, a failure to accommodate claim fails if the plaintiff cannot first establish that she is a "qualified individual" with a disability. *Basith*, 241 F.3d at 932 ("[w]e need not decide whether Basith was denied reasonable accommodation in light of his failure to show a question of fact existed as to whether he was a qualified individual with a disability") (internal quotations omitted); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (explaining that a failure to accommodate under the ADA requires a *prima facie* showing that the plaintiff is or was a qualified individual with a disability).

In the current litigation American challenges only Bilinsky's status as a qualified individual; they do not dispute that Bilinsky is a person who is disabled or that they were aware of her disability. *See* (Dt. No. 60, at 5-6). To determine whether an individual is "qualified" the Court must look to "whether the individual satisfies the prerequisites for the position and then turn[s] to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018). American doesn't dispute

**RSA 9**

Bilinsky's qualifications, *see* (Dkt. No. 60, at 6 n.4), so the Court focuses solely on her ability to perform the essential functions of the position. Whether a function is essential is a question of fact. *See Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) ("[t]he essential-function inquiry is a factual question, *not* a question of law") (emphasis in original). Essential functions are determined by looking at factors including but not limited to the employer's judgment as to which functions are essential, the consequences of not requiring the employees to perform the function, and past and current work experiences. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2014); *see also* 29 C.F.R. § 1630.2(n)(3). The presumption is that the employer's judgment as to what is essential is correct unless the plaintiff offers sufficient evidence to the contrary. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010); *Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011); *Coleman v. Caterpillar, Inc.*, 2017 WL 3840423, at *6 (C.D. Ill. Sept. 1, 2017) (presumption in favor of employer where plaintiff did not offer evidence to the contrary that employer's understanding that at least occasional physical presence at work was essential to the job of advanced purchasing analyst). But while the employer's judgment is one factor to consider it is not controlling and the Court looks at the employer's actual practices in the workplace as well. *See DePaoli v. Abbott Labs.*, 140 F.3d. 668, 674 (7th Cir. 1998) ("[a]lthough we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions … we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job"); *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011); *Shell v. Smith*, 789 F.3d 715, 718 (7th Cir. 2015).

**RSA 10**

A "reasonable accommodation" may include things such as making work facilities accessible to individuals with disabilities, or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. *See* 42 U.S.C. § 12111(9)(A)-(B).

Turning first to the employer's judgment, it is undisputed that American decided an everyday presence was an essential function of the Communications Specialist position after the merger with US Airways. (In American's view, after the merger the level of intra- and inter-departmental coordination made daily availability at DFW vital for all communications employees. *See* (Dkt. No. 60, at 7). Hector Adler, American's Vice-President of the Flight Service Department described the merger process as a "very extensive and significant task that involved nearly every person in the [D]epartment." *See* (Dkt. No. 67-6, Ex. E, at 23:8-17); *see also* (Dkt. No. 61, at ¶ 30). After several months of observing Department operations, Adler concluded that the Department was not adequately responding to the unpredictable issues arising on a day-to-day basis. *See* (Dkt. No. 67-6, Ex. E, at 27:20-28:13). As the person responsible for setting the operational direction of the Department, and with the desire to create a productive response team, Adler decided to transition the Department from what he called an "e-mail shop" to a team with a "different level of engagement and involvement from all the team members." *See* (Dkt. No. 67-6, Ex. E, at 21:11-24); *see also* (Dkt. No. 61, at ¶¶ 32-33). Consequently, he set in place the requirement that all Department employees be physically present at DFW five day per week. *See* (Dkt. No. 67-6, Ex. E, at 58:13-19); *see also* (Dkt. No. 61, at ¶ 37). American

**RSA 11**

asserts that because Bilinsky refused to relocate to Texas, she could not perform this essential function of the positions as newly defined and therefore is not a qualified individual.

American's shift in essential function is corroborated by testimony consistent with the fact that the change was complex and hectic in the post-merger environment and exhibits the problems associated with not having all Department employees available at DFW headquarters. For example, Adler noted the importance of "the ability to interact quickly as situations arose" and stated that "it would have been unfair to other members of the team to constantly be pulled onto assignments simply because they were present and others were not." *See* (Dkt. No. 67-6, Ex. E, at 42:1-13). Bilinsky's former manager, Linda Carlson, expressed the importance of having [communications] teams centrally located after the merger. *See* (Dkt. No. 75, at 3); (Dkt. No. 67-8, Ex. G, at 26:19-22). Another former manager, Cathy Scheu, testified that "as we moved through [the merger process] ... we really did need for people to be at headquarters, particularly the communications group." *See* (Dkt. No. 67-7, Ex. F, at 46:11-22).

Bilinsky does not dispute her inability to be physically present at DFW five days per week. Rather, she asserts that the record shows a genuine dispute of fact as to whether her daily attendance was an essential function. *See* (Dkt. No. 71, at 7). Further, she reminds the Court not to "simply defer" to the employer's judgment about what constitutes an essential function. *Id*. She also points to her history of performing the job remotely and includes testimony from her supervisors stating that even after the merger she performed duties normally assigned to others and was willing to "pick up the slack." *See* (Dkt. No. 67, at ¶ 19); (Dkt. No. 67-8, Ex. G, at 27:7-13). But these facts do not sufficiently outweigh

**RSA 12**

American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute.

First, Bilinsky ignores a key fact: that her job duties changed after the merger; requiring a physical presence in Dallas. American does not dispute that Bilinsky satisfactorily performed her job duties from home prior to the merger, but multiple American employees uniformly agree that is was in America's best interest to require the communications staff have a daily physical presence at DFW headquarters after merging with US Airways. When an employee is facing a "policy change that came from above" and the policy change requires the presence of an employee in a specific location, that becomes an essential job function. *See e.g. Gratzl*, 601 F.3d at 680 ("[Plaintiff] cannot prove that she is qualified for her current job simply by citing that show was qualified for a previous job, with different essential functions, that has been eliminated.") In *Gratzl*, for example, the plaintiff had served as a court reporter who worked exclusively in a control room of the courthouse. This was ideal for plaintiff who suffered from incontinence and could take frequent bathroom breaks. But the State eliminated her job of court reporting specialist and required all court reporters to rotate throughout all the courtrooms in the courthouse. Plaintiff refused to rotate, and the courthouse employer worked to see if other accommodations would work such as placing her in juvenile courtrooms, but all proposals were rejected by plaintiff and as such she was given notice of termination. In finding that the district court correctly granted summary judgment for the employer, the Court found that plaintiff's refusal to "consider any accommodation that required that she do in court reporting strongly suggested that she believed she was incapable of performing this function. Therefore, she is not qualified for the job." *Id.*

**RSA 13**

Similarly, the undisputed facts, such as testimony from Adler, Scheu, Carlson and Nicol-Perin, shows that American had a legitimate reason for altering the job requirements and the actions they took substantiate the need to do so. *See e.g., Walter v. Wal-Mart Stores Inc.*, 2011 WL 4537931, at *11 (N.D. Ind. Sept. 28, 2011) (citing *Gratzl*, 601 F.3d at 680) ("[a]n employee's job description is permitted to evolve, and an employer is not required to maintain an existing position or structure that, for legitimate reasons, [the employer] no longer believes is appropriate") (internal quotation marks omitted). With two major airlines merging, American's decision to mandate its communications team to work out of DFW is similarly appropriate. Similar to the plaintiff in *Gratzl*, Bilinsky can perform the communications job that she had, but her refusal to perform the functions of that job five days a week in person in the Texas headquarters where her employer has now deemed it essential for purposes of employing a responsive communications team that is not merely emailing responses, demonstrates that she is not qualified for the position. As the Court noted in *Gratzl*:

> Another way to look at the question is whether the only accommodation that Gratzl requested—exclusive assignment to the control room—was a reasonable accommodation. Because Gratzl bears the burden of establishing that she can perform the essential functions of her job with or without reasonable accommodation," (cite omitted) she has not met this burden if the only accommodation she has ever suggested is not reasonable.

*Id.*

Second, the fact that Bilinsky's supervisor found her work ethic and work-product post-merger satisfactory is irrelevant to whether a physical presence at DFW became an essential work function according to American. *See Taylor-Novotny*, 772 F.3d at 493 (the plaintiff bears the burden of proving she is a qualified individual by showing an ability to perform *all* essential functions). The relevant issue is not about how well Bilinsky could

14

**RSA 14**

do the work; rather it is about the work she could not do at all. *See Gratzl* at 680.For example, while commending Bilinsky's willingness to "pick up the slack" on a project, Carlson (her supervisor) noted that by working from home, "[Bilinsky] just wasn't able to do things that you needed to do to support an event," such as driving to an event, checking out equipment, or directly meeting with flight service subject matter experts. *See* (Dkt. No. 67-6, Ex. G, at 27:7-18). As mentioned above, the evidence suggests that Bilinsky's absence put a strain on other employees who were called upon more frequently where those who were not at DFW could not contribute equally. *Id*., Ex. E, at 41:21-42:13; *see also Coleman*, 2017 WL 3840423, at *6 (although the plaintiff's performance was not officially deemed unsatisfactory while working remotely, she still failed to carry her burden of proof establishing that physical presence at work was not an essential function because her absence placed a greater burden on co-workers).

Additionally, it's worth noting that the other two communications employees who previously worked from home were not permitted to continue under their similar WFHA situations. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17). American also states that, currently, no Department employees with "headquarters positions" work from home. *See* (Dkt. No. 61, at ¶¶ 43-44); (Dkt. No. 60, at 7). As such, American offers substantial evidence supporting its determination that a physical presence at DFW was an essential function of the Communications Specialist positions after the merger while Bilinsky offers insufficient evidence to create a dispute of material fact. Deference to American's judgment as the employer is required in the absence of an adequate factual or legal basis to abandon that deference. *See Gratzl*, 601 F.3d at 679; *DePaoli*, 140 F.3d at 674.

15

Bilinsky relies on *Shell v. Smith*, *Miller v. Illinois Department of Transportation*, and *Bixby v. Morgan Chase Bank*; all three are readily distinguishable.

In *Shell v. Smith*, before remanding for a factual dispute, the court held that a change in management did not impact whether a task was an essential function of a job; rather the inquiry should focus on actual employment practices and the plaintiff's prior performance.[5] 789 F.3d at 718-19. In contrast to the plaintiff in *Shell*, the fundamental aspects of Bilinsky's job changed because the Flight Services Department served a considerable communications role during the merger. Where in *Shell* the job description remained the same after the change in management, the actual duties required of Bilinsky by American changed because of the merger with US Airways.

She also relies on *Miller v. Ill. Dep't of Transp.*, a case where an employee with a fear of heights was denied an accommodation that he not work "on bridge beams and other extreme places" over a certain height after suffering a panic attack on an overpass construction job. *See Miller*, 643 F.3d at 192-94. In reversing summary judgment for the employer, the court held that the locations where Miller worked were not actually an essential function of his job; rather they were easily modifiable assignments and so he could not request an accommodation based on them. *Id*. at 200. In contrast, Bilinsky's Department duties changed after the merger and those changes directly impacted the employment location. The plaintiff in *Miller* effectively asked his employer to formalize for him what the Court said was already occurring in the normal course of business – to

---

[5] The employee, who suffered from hearing and vision impairment, was a mechanic's helper and the job description said the position may occasionally involve driving buses. But to drive the buses an employee needed to have a commercial driver's license ("CDL"). Based on the vision and hearing impairments the employee could not obtain a CDL. This was not an issue until the employer came under new management, which terminated the plaintiff for failure to obtain a CDL. *See Shell v. Smith*, 789 F.3d at 716, 721.

16

**RSA 16**

reassign him to tasks or jobs that did not involve danger of heights. *Id.* To the contrary, the merger in this matter altered what was the normal course of business for American and its employees and so *Miller* is inapplicable.

Next Bilinsky relies on *Bixby v. JP Morgan Chase Bank, N.A.* – a case where the district court held that allowing a plaintiff to work from home for a period constitutes a reasonable accommodation because the employer allowed other similarly situated employees to work from home as well. *See* 2012 WL 832889, at *11 (N.D. Ill. Mar. 8, 2012). First, this Court is not bound by decisions of other district court judges. Second, the facts as to the reasonableness of the work-from-home arrangement in *Bixby* suggest that such an accommodation was reasonable and would not impact job performance. *Id.* at *9-11. In contrast, the evidence here shows that the merger resulted in a change in job responsibilities that could not be readily performed from home. *See* (Dkt. No. 67-7, Ex. F. at 48:5-13). This is supported by the actions of American who did not permit two other employees with WFHAs to continue doing so after the merger. *See* (Dkt. No. 61, at ¶ 37); (Dkt. No. 62-2, Ex. 6, at 32: 15-39:17).

Bilinsky also argues that American did not adequately engage in the interactive process to provide a reasonable accommodation. *See* (Dkt. No. 71, at 15). However, because she failed to sustain her burden of proving that she was a qualified individual the question of whether American offered her a reasonable accommodation is moot. *See* *Basith*, 241 F.3d at 932; *see also Stern*, 788 F.3d at 292 ("the employee must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job"). There is no factual dispute about whether Bilinsky was a qualified individual after the Communications Specialist position changed due to the merger; she

was not.  The change in the position requirements after the merger altered the essential functions to include a physical presence at DFW and Bilinsky refused to relocate.  Even if Bilinsky were entitled to a reasonable accommodation there is no dispute that American made every effort to place Bilinsky in other employment positions, worked with her to find another position, and considered her for other positions.  As such, American's motion for summary judgment as to the ADA claim for failure to accommodate (Count I) is granted.

## B.  Retaliation

An employer is equally prohibited from retaliating against any individual who asserts a right pursuant to the ADA.  *See* 42 U.S.C. § 12203(a).  An aggrieved employee can show retaliation through either direct or indirect methods of proof.  *See Dickerson*, 657 F.3d at 601.  Bilinsky does not allege or argue facts consistent with the indirect method by, for example, trying to show that similarly situated employees received more favorable treatment.  *See Mobley*, 531 F.3d at 548 (enunciating the elements for an indirect method of proof for ADA discrimination including comparison of treatment to similarly situated persons).  Under the direct method of proof Bilinsky must demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two.  *Rodrigo*, 879 F.3d at 243.

"To show causation under the direct method, an employee must show that her protected activity was a substantial or motivating factor behind the adverse employment action."  *Taylor-Novotny*, 772 F.3d at 495 (internal citation and quotations omitted).  One way to establish causation is by showing a direct admission of retaliatory motive.  *Id*.  Another way is to present a "convincing mosaic" of circumstantial evidence supporting an inference of retaliatory animus.  *Id*.  Categories of circumstantial evidence include: (1)

"suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn[;]" (2) "evidence … that similarly situated employees were treated differently[;]" and (3) "evidence that the employer offered a pretextual reason or the adverse employment action." *Id*.

To begin, the record is clear that Bilinsky did not have the requisite qualifications for the Corporate Sales position in Chicago, Illinois. *See* (Dkt. No.61, at ¶¶ 67-68, 73). Based on these undisputed facts, American cannot be said to have retaliated against Bilinsky by not selecting her for the position in Chicago; instead they simply did not hire her because she lacked the experience.

As for the Analyst Manuals position in Texas, Bilinsky does not set forth any evidence of suspicious timing, ambiguous statements, or a discrepancy between similarly situated employees. [6] She argues only that American lacked a legitimate, non-discriminatory basis for denying her the Analyst Manuals position because (1) it was previously held by someone with a similar work-from-home arrangement; (2) her interviewer and would-be supervisor was aware of her current WFHA and still indicated that Bilinsky was her "top choice" for the position; (3) her current supervisor, Adler, knew that she applied for the position; and (4) no evidence suggests that American considered the job duties in determining Bilinsky was unqualified because the position required a physical presence at DFW as an essential function. *See* (Dkt. No. 67, at ¶¶ 26-29); (Dkt. No. 71, at 19). Even if Bilinsky had argued suspicious timing the argument fails because of the length of time between her request for accommodation and the date they informed her of the hiring decision for the Analyst Manuals position. *See* (Dkt. No. 67, at ¶ 26);

---

[6] Although Bilinsky references employees who have WFHA agreements as of 2017, they are not comparable because they do not hold "headquarters positions" and so they are not similarly situated.

**RSA 19**

(Dkt. No. 60, at 17); *Mobley*, 531 F.3d at 549 (suspicious timing is generally limited to days, or at most, weeks of the employee's exercising a protected right). Furthermore, the record is devoid of ambiguous statements or examples of similarly situated employees receiving preferential treatment in hiring after requesting an accommodation.

The parties do not dispute that Bilinsky's request for an accommodation constitutes a protected activity or that American's decision to deny her the position constitutes an adverse action. But even assuming these elements are satisfied, Bilinsky cannot establish a causal connection between her request for an accommodation and American's decision not to offer her the Analyst Manuals position. She offers no direct evidence relating the actions and does not cite any circumstantial evidence which permits a reasonable inference that American retaliated against her. There is no evidence that Laura Risley – the woman who interviewed her and would have been her supervisor – was aware that Bilinsky had a pending request for accommodation with American. Further, although Adler knew of her request for accommodation, Bilinsky states Adler "had no vendetta" against her. *See* (Dkt. No. 61, at ¶ 80). In fact, she admits her belief for not getting the position was because "Adler decided that all individuals in his department needed to be physically present at headquarters." *See* (Dkt. No. 67, at ¶ 79). Bilinsky further states it was her opinion that she was denied the position for "the same reason that American didn't allow her to stay" in her Communications Specialist job. *See* (Dkt. No. 61, at ¶ 80). These assertions essentially undercut her claim of retaliation because Adler's decision that all Department employees had to be present at headquarters is precisely a "legitimate, non-discriminatory basis" for denying her the position.

20

**RSA 20**

In response to other facts noted by Bilinsky, American also points out that the Analyst Manuals position was open in the first place because the previous employee refused to alter her work-from-home arrangement and was subject to reduction-in-force. *See* (Dkt. No. 61, at ¶ 42). Additionally, even if Bilinsky was Risley's first choice for the position that fact bears little significance in the context of the entire record. Bilinsky even acknowledges that Risley could not unilaterally approve her hiring and that American's motive was operational in nature.

There is no disputed fact requiring a jury to determine whether American retaliated against Bilinsky by not hiring her for positions that either she was not personally qualified for or that required a physical presence at American's DFW headquarters. Therefore, American's motion for summary judgment is granted as to the claim for retaliation (Count II).

## C. IHRA Claim

Given that the American is entitled to summary judgment on the ADA claims (Counts I and II), the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claim alleging a violation of the Illinois Human Rights Act, 775 ILCS 5 § 1-102, *et seq.* Of course, where a district court has original jurisdiction over some claims, such as the ADA claims alleged by Bilinsky, it has supplemental jurisdiction over other claims that are so related that they form a part of the same case or controversy. *See Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). But if the district court dismisses all claims over which it has original jurisdiction, the court's supplemental jurisdiction persists with the caveat that the court can elect to decline to exercise supplemental jurisdiction at its discretion. *Id*. at 738. "[I]t is the well-established law of this circuit that

**RSA 21**

the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Yet there are three exceptions to this general rule, which are: (1) where any applicable statute of limitations has run, precluding the filing of a state court claim; (2) where the court has already committed substantial resources; and (3) when resolution on the pendant claim is "absolutely" clear. *See Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Based on the decision above regarding the ADA claims and the applicable law in Illinois related to IHRA claims, the third exception applies and so the Court addresses Bilinsky's IHRA claim below.

"The IHRA provides a comprehensive scheme of procedures and remedies for redressing human rights violations." *Rabe v. United Air Lines, Inc.*, 971 F.Supp.2d 807, 819 (N.D. Ill. 2013) (Pallmeyer, J.) (citing 775 ILCS 5 § 1-101, *et seq.*). Bilinsky alleges violations of the IHRA against American for denying her request to continue her WFHA as a Communications Specialist, and for taking "adverse actions" in denying her Corporate Sales and Analyst Manuals positions. *See* (Dkt. No. 1, ¶¶ 27-29). Both Parties agree that the Illinois Supreme Court has adopted the same standard, or analytical framework, employed in federal employment discrimination cases for IHRA claims. *See Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (1989); *see also Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016); *Compare* (Dkt. No. 60, at 18), *with* (Dkt. No. 71, at 20). Application of this standard leads to the same result. Where the Court holds there is no genuine dispute of a material fact and judgment as a matter of law proper for the ADA claims (Counts I and II), so too is the case for Bilinsky's IHRA claim. No reasonable jury could return a verdict in favor of Bilinsky based on the

RSA 22

undisputed facts before the Court and so American's Motion for Summary Judgment on the IHRA claim is also granted.

<u>**CONCLUSION**</u>

American's Motion for Summary Judgment as a matter of law is granted as to all three counts.

_____
Hon, Virginia M. Kendall
United States District Judge

Date: August 31, 2018

**RSA 23**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Kimberly Bilinsky,

Plaintiff(s),

v.

American Airlines, Inc.,

Defendant(s).

Case No.  16 C 4253
Judge Virginia M. Kendall

## **JUDGMENT IN A CIVIL CASE**

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒     in favor of defendant(s) American Airlines, Inc.
and against plaintiff(s) Kimberly Bilinsky

.

Defendant(s) shall recover costs from plaintiff(s).

---

☐     other:

---

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☒ decided by Judge Virginia M. Kendall on a motion for summary judgment.

Date:   8/31/2018                    Thomas G. Bruton, Clerk of Court

                                     /s/ Lynn Kandziora, Deputy Clerk

**RSA 24**